UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT HANEY, | **MEMORANDUM AND ORDER** |
| – against – | 08-CV-5225 |
| MILLER'S LAUNCH, INC. , et. al. | **FILED**<br>IN CLERK'S OFFICE<br>U.S. DISTRICT COURT E.D.N.Y.<br>★ **NOV 1 6 2010** ★<br>**BROOKLYN OFFICE** |
| Defendants. | |

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Appearances:**

For Plaintiff:   STEVEN L. BARKAN P.C. and GERALD P. GOLDSMITH, ESQ.
445 Broad Hollow Road, Suite 25
Melville, NY 11747

For Defendants:   Rubin, Fiorella & Friedman LLP
292 Madison Avenue, 11th Floor
New York, NY 10017
By: MICHAEL E. STERN

**Table of Contents**

I.   Introduction ..................................................................................................... 2

II.   Facts and Procedural History ........................................................................... 2

   A.   Incident ...................................................................................................... 3

   B.   Maintenance and Repair Policy ................................................................. 4

   C.   Subsequent Remedial Measure ................................................................. 5

   D.   Proceedings ............................................................................................... 6

III.   Contentions of the Parties ............................................................................... 6

IV.   Law and Application of Facts to Law .............................................................. 7

   A.   Summary Judgment Standard ..................................................................... 7

   B.   Negligence ................................................................................................. 8

      1.   Duty to Provide Competent Crew ........................................................ 8

      2.   Duty to Follow Internal Policies on Maintenance and Repair .................... 10

3. Duty to Provide Medical Care .................................................................................. 10

C. General Maritime Law ................................................................................................ 12

D. Limitation of Vessel Owner's Liability Act .................................................................. 13

E. Maintenance and Cure .............................................................................................. 15

1. Generally ............................................................................................................ 15

2. Pain .................................................................................................................... 16

3. Additional Treatment .......................................................................................... 21

V. Conclusion .................................................................................................................... 22

### I. Introduction

Claimed are injuries to a sailor due to unseaworthiness and negligence of the vessel owner. The case raises standard issues of limited liability, cause of injury, and maintenance and cure.

One new question is posed: Does medical treatment to reduce pain and suffering come within the definition of "cure?" While the law of this circuit is unclear, and the law of other circuits as well as tradition suggest the answer is "no," changes in the view of the medical profession and the public on the subject of pain amelioration answer "yes." The cost of palliative medical attention to reduce pain, even after physical injuries have been corrected to the extent practicable, should be included in treatment and cure of injured seamen.

### II. Facts and Procedural History

Robert Haney sues Miller's Launch, Inc. ("Miller") for negligence, alleging that defendants failed to properly maintain and operate the vessel, Marguerite Miller ("Marguerite"); that the vessel was unseaworthy; and that defendants failed to provide him with prompt medical care for injuries he sustained when the vessel hit a pier. He seeks additional maintenance and cure payments for back and neck pain and surgery.

2

Miller moves for summary judgment, or in the alternative, a limitation on liability. For the reasons stated below defendant's motion for summary judgment and limitation on liability is denied. For purposes of this motion, the plaintiff's well-supported factual allegations are accepted as true, with reasonable inferences drawn in his favor.

## A. Incident

Miller is a New York corporation that owns the 42-foot crew boat Marguerite. Complaint ("Compl.") at ¶ 1; Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Defs.' St.") at ¶ 1. The Marguerite provides water taxi service throughout the New York ports' waterways, constantly stopping and starting at various shore locations and shipsides. Robert Haney was a deck hand aboard the Marguerite captained by Mike McCabe.

The vessel was traveling from its base on Staten Island to a pier in Manhattan. Compl. at ¶ 10; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl's. Opp.") at 1. Prior to departure, Captain McCabe visually inspected the vessel to check the oil and water levels. Id.; Defendants' Reply Memorandum of Law ("Defs.' Reply") at 3. He turned the wheel and moved the throttle's control levers on each of the two engines to verify that the vessel could move forward and astern. Pl's. Opp. at 1. He did not examine the engines or transmission controls. Id.

Wind and tide made the water choppy. Plaintiff's Rule 56.1 Statement of Undisputed Facts ("Pl.'s St.") at ¶ 23. When the vessel ran into the pier and then a bulkhead while docking at 34th Street, Haney was thrown to the deck. Compl. at ¶ 13. He sustained injuries to his back and neck and sought immediate medical attention. Id. at ¶¶ 16, 18; see also Pl. Ex. A at 74-79.

Captain McCabe contacted Miller's port office to request medical attention for Haney. Pl. Ex. A at ¶¶ 90-94. Vice President of Operations for Miller, Sven Van Batavia, instructed the

3

captain to return to Staten Island before providing aid because he believed there was too large a difference in height between the Manhattan pier and the vessel's deck to safely offload Haney. Pl. Ex. D at 32-33; Defs.' Reply at 4-5. Yet, during his deposition, Batavia testified that he did not then know what the difference was. Pl. Ex. D at 34-38. And he did not check with New York's Emergency Medical Services to see if it would have had undue difficulty removing Haney from the vessel to a nearby Manhattan hospital. *Id.* Four hours after the accident, Haney arrived at the vessel's home port in Staten Island where he received his first medical treatment. Pl.'s St. at ¶ 29; Pl. Ex. A at 93; Pl. Ex. D. at 40-42.

## B. Maintenance and Repair Policy

Amilcar Matos, Miller's Port Engineer, was in charge of the maintenance and repair of all ship equipment. Pl. Ex. B. at 5-7. Miller had a full service repair facility at Staten Island. *Id.*; Defs.' Mem. at 4; Def. Ex. 5 at 43 (deposition testimony of Haney). Preventative maintenance is conducted as a matter of company policy. Pl. Ex. B at 22. When a repair is needed the captain completes a maintenance sheet and places it in Matos' folder. Pl. Ex. B. at 17. It is the captain's responsibility to report any problems regarding transmission controls on a vessel. *Id.* at 27-28. Reliance is placed by Miller on the captain's performing daily inspections, completing safety sheets each morning, and executing a maintenance report for each needed repair.

Matos has only inspected the Marguerite once every two years over the past sixteen years. *Id.* at 29-30. He testified that a transmission issue is a serious "non sail item, you can't leave the dock" without its being in good order. *Id.* at 28.

It is agreed that the accident was caused by the failure of a cotter pin (never recovered by Miller) on the transmission's control lever. The company's maintenance repair program does not specifically provide for inspection of this pin. *See* Defs.' Mem. at 4.

4

A few months prior to the incident, a complaint had been made relating to a cable failure on the Marguerite's transmission; a repair order was submitted to Matos. Pl. Ex. A at 43-49. Before the accident, the Marguerite also experienced a mechanical throttle problem that involved ability to control speed. Pl. Ex. A at 43-49 (testimony of Haney that he reported a problem with the Marguerite involving the throttle to his captain and other personnel in the maintenance department a few months before the collision). There was no record in the vessel's maintenance file relating to these deficiencies in the vessel's control system or of their repair. Pl.'s St. at ¶ 32; Pl. Ex. B at 43-49 (Testimony of Amilcar Matos); Pl. Ex. D at 45 (Testimony of Sven Van Batavia); Pl. Ex. E. (relevant portions of vessel's maintenance records). The vessel's logbook did not refer to a broken cotter pin or any problem in the engine room. Pl.'s St. at ¶ 49; Pl. Ex. H (logbook page for the Marguerite dated April 4, 2007). To date, the allegedly guilty cotter pin has not been produced or inspected.

## C. Subsequent Remedial Measure

The first reported repair on the vessel was twelve days after Haney was injured. *See* Pl.'s St. at ¶ 33. Matos and Batavia testified that, after the accident, on instruction from the Coast Guard, a system-wide change was made on all of Miller's vessels; the cotter pin was replaced with a screw and locknut to better secure the cable to the transmission. *See* Pl.'s St. at ¶ 35.

Evidence of this subsequent remedial measure will not go to the jury. It is arguably inadmissible as a subsequent remedial measure. *See* Fed. R. Evid. 407 (subsequent remedial measures); *but see*, Dan M. Kahan, The Economics—Conventional, Behavioral, and Political— of "Subsequent Remedial Measures" Evidence, 110 Colum. L. Rev. 6, 1616-1653 (2010) (arguing that the categorical ban on subsequent remedial measures evidence should be replaced with a case-by-case analysis of whether such proof should be admitted). It is also excluded

under Federal Rules of Evidence 401- 403 (relevance and exclusion on grounds of confusion and waste of time), since the claim is not predicated on a design defect, but on lack of seaworthiness and failure to inspect and repair.

### D. Proceedings

Jurisdiction is based on the Jones Act. 46 U.S.C. App'x § 688 et. seq and 28 U.S.C. § 1333. Summary judgment is sought on the following grounds:

(1) The vessel was not negligently operated;

(2) The vessel was not negligently maintained and was seaworthy; and

(3) Haney is not entitled to additional maintenance and cure payments because he had obtained "maximum medical improvement," and residual pain and suffering is not compensable.

*See* Memorandum of Law in Support of Defendant Miller's Launch, Inc. Motion for Summary Judgment ("Defs.' Mem.") at 1.

Defendants also move to limit their liability to $75,000, the claimed value of the vessel. *Id.* at 2.

### III.    Contentions of the Parties

Miller contends that there is no evidence of negligence. Even if there were negligence, defendants argue for limited liability because the actionable conduct was outside the knowledge or privity of the owner or manger. *See* Defs.' Mem. at 1. They insist that Haney has not submitted any evidence that Captain McCabe negligently operated the vessel or that there were any deficiencies in defendants' maintenance and repair program or its execution. *Id.* at 3-5; Defs.' Reply at 1. They submit that the collision was due to an unforeseeable failure of the cotter

pin, causing a transmission cable to detach from the transmission, Defs.' St. at § 6; Defs.' Mem. at 3; Defs.' Reply at 4; Defs.' Ex. 7 (Vessel Incident Report); there were no prior issues with the cotter pin; and the vessel was operating normally before the collision. Defs.' St. at 8; Defs.' Mem. at 7-9.

Plaintiff's view is that Miller was negligent by failing to implement a proper maintenance and repair program. He argues that the vessel was unseaworthy because of serious mechanical deficiencies with the transmission that were known or should have been known to defendants prior to the collision.

## IV.    Law and Application of Facts to Law

### A. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.2004). Dismissal is warranted when, after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 247-50, 255; *Sledge v. Kooi*, 556 F.3d 137, 140 (2d Cir.2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. See Fed. R. Civ. P. 56(e). "Mere conclusory allegations, speculation, or conjecture"

7

will not suffice. *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990).

### B. Negligence

The Jones Act provides a federal remedy for seamen injured as a result of negligence. *See* 46 U.S.C. App'x. § 688(a) (2000) ("[A] seaman who shall suffer personal injury in the course of his employment may . . . maintain an action for damages at law . . ."); *see also Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001). The plaintiff must prove by a preponderance of the evidence that: (1) he was employed by the defendant as a seaman and was acting within the scope of his employment at the time of the accident; (2) defendant's actions were negligent; and (3) defendant's negligence caused his injuries. *Nasser v. CSX Lines, LLC*, 191 F.Supp.2d 307, 314 (E.D.N.Y. 2002).

Negligence is "the failure to employ reasonable care given the circumstances." *Id.* "The vessel owner owes his seamen an obligation of fostering protection, which typically translates into a higher duty of care than that accorded to land based torts." *Id.* (citing *Saleh v. United States*, 849 F.Supp. 886, 891 (S.D.N.Y. 1994) (internal quotations and citation omitted)). Proof of causation under the Jones Act requires a "substantially relaxed quantum of proof . . . . [P]laintiff need only demonstrate that defendant's negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Nasser*, 191 F.Supp.2d at 314 (internal quotations and citation omitted).

### 1. Duty to Provide Competent Crew

A vessel owner has a duty to use "due and proper care" to provide a competent crew – including the captain on board. *Messina v. Murray*, 574 F.3d 119, 127 (2d Cir. 2009) (quoting

*Tug Ocean Prince, Inc, v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978)). The owner's belief in the ability of the individual in charge of the vessel must be "objectively reasonable." *Messina*, 574 F.3d 119 at 127. "It is hornbook law that when a moving vessel strikes a stationary object an inference of negligence arises and the owner of the vessel then has the burden of rebutting such inference." *Tug Ocean Prince*, 584 F.2d at 1159.

Undisputed is the fact that Haney was employed as a seaman – a deckhand – for Miller and that he was working in that capacity on the Marguerite at the time of the incident. *See* Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp.") at ¶¶ 1, 2; Pl. St. at ¶¶ 11, 12.

Defendants' expert opines that Captain McCabe was "safe and prudent" in his operation of the vessel. *See* Defs.' Mem. at 6. Nevertheless, the assertion that plaintiff fails to raise "a scintilla" of evidence pointing to negligent operation, Defs.' Reply at 1, is not sufficiently persuasive to warrant summary judgment. Haney may be able to prove that Captain McCabe used excessive speed when docking. He states that the captain "failed to change the engine's direction" which "caused him to lose control of the vessel so that it struck the pier." Am. Compl. at ¶ 14; Pl.'s Mem. at 3.

While Haney admits that Captain McCabe performed a general visual inspection of the vessel and tested controls to ensure that the vessel could move in forward and reverse, Pl.'s Resp. at ¶ 3, he points out that the captain did not inspect the transmission or cable throttle assembly prior to departure. Pl.'s Resp. at ¶ 3; Pl. Ex. A at 62. A jury could find that defendant should have, but did not, properly inspect the pin. Failure of Miller to locate and produce the cotter pin, which would have probably fallen into the bilge if it broke, will not help defendants' case.

9

Haney testified that McCabe was a "great captain." Haney Deposition, Def. Ex. 5 at 61. This concession does not disprove the claim that his leader failed on this occasion.

### 2. Duty to Follow Internal Policies on Maintenance and Repair

A shipowner has a duty to provide a reasonably safe work environment aboard ship. Required are internal policies ensuring proper maintenance and repair of the vessel. *See In the Matter of the Compl. of the City of New York as Owner of the M/V Barberi ("Barberi")*, 475 F.Supp.2d 235, 240-41 (E.D.N.Y. 2007) (finding City's internal rules are relevant to determining what constitutes due care); *see also, de Kwiatkowski v. Bear, Stearns & Co. Inc.*, 306 F.3d 1293, 1311 (2d Cir. 2002) ("[N]oncompliance with internal standards could be evidence of a failure to exercise due care, assuming . . . a duty as to which due care must be exercised.").

It is undisputed that Miller had a maintenance and repair system in place. *See* Pl. Ex. A at 43-44; Defs.' Mem. at 5. But, there is evidence that the system was not followed before the incident. It took nearly sixteen days to complete a maintenance repair form after the collision. Pl.'s St. at ¶ 33. Maintenance forms are not properly indexed or organized, leading to possible lapses in performing repairs. Pl.'s St. at ¶ 44. Neither Batavia nor Matos, both assigned with overall maintenance and supervisory responsibilities, inspected the vessel before the incident, nor did they investigate the cause of a previously reported transmission failure. Pl.'s St. at ¶ 33. The maintenance and repair program does not contain a specific directive to inspect the vital cotter pin.

### 3. Duty to Provide Medical Care

A shipowner has an obligation to provide medical care to a seaman who falls ill or is injured while serving aboard a vessel. *Nasser*, 191 F.Supp.2d at 316. Failure to put the vessel

10

into the nearest sanctuary to obtain professional medical treatment for the seaman after he is injured may violate this duty. *See Carr v. Standard Oil Co.*, 181 F.2d 15, 16 (2d Cir. 1950). The relevant determinative factors include "the seriousness of the seaman's condition, the shipboard care available and rendered, the availability of professional aid at the port, the master's knowledge of the facilities at the port, the promixity of the port and . . . the consequences to the shipowner's interests which would result from a deviation from course." *See* 16 A.L.R. Fed. 87 (1973) (citing numerous cases discussing these factors in determining vessel owner's negligence for delay in medical treatment for an injured seaman).

Plaintiff alleges that following the collision he required immediate medical attention. Pl. St. at ¶ 19. He expected the New York City Emergency Medical Services to take him off the vessel, which was at a dock readily reachable by ambulance, and to provide him with prompt medical treatment. *Id.* Captain McCabe wanted to remove Haney from the vessel immediately so he could be treated in a nearby Manhattan hospital. *Id.* at ¶ 20; Pl. Ex. A at 90-94; Pl. Ex. D at 32, 33. Countermanding the on-the-scene officer-in-charge, Batavia ordered a return to Staten Island with the ailing Haney. Pl.'s St. at ¶ 20; Pl. Ex. A at 90-94; Pl. Ex. D. at 32-38. As a result, Haney waited four hours before receiving any treatment. Pl.'s St. at ¶ 28. Arguably, this delay was unwarranted, causing unnecessary pain and, possibly, further injury.

Defendants' theory for returning to Staten Island with an injured seaman on board could be rejected by a jury as unpersuasive. Haney's injury was obviously serious. When the vessel struck the pier Haney was thrown backwards and struck his neck on the hatch. He stood up and was knocked down again when the vessel hit the bulkhead. Pl.'s St. at ¶ 13. Passengers and other crewmembers assisted him after the collision. Pl.'s St. at ¶ 18; Pl. Ex. A at 72-89. There is evidence that no medical care was provided aboard the vessel. It had reached its destination in

Manhattan, and the evidence may demonstrate that Emergency Medical Services could have immediately taken him to a local hospital. Defendants do not provide persuasive evidence supporting a return to Staten Island before providing Haney with appropriate medical assistance. The rough water conditions, combined with possible engine transmission failures supported the need to seek immediate medical attention at the scene rather than to risk further injury to plaintiff during the rough journey back to Staten Island. The jury could find that immediate disembarkation was the prudent choice.

### C. General Maritime Law

Under the doctrine of unseaworthiness, a vessel owner has the duty to provide its seamen "with a ship and appurtenances that are reasonably fit for their intended purposes." *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54 (2d Cir. 1978) (per curiam). The general rule is that the vessel must be "staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." *Tug Ocean Prince*, 584 F.2d at 1155. This duty is absolute, but it does not require perfection or an accident-free vessel. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). The standard is "reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Nasser*, 191 F.Supp.2d at 314-15.

If a plaintiff establishes unseaworthiness the ship owner is strictly liable. *See Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94-95 (1946). The plaintiff may establish causation by proving that the "unseaworthiness played a substantial part in bringing about or actually causing the injury, and . . . the injury was either a direct result or reasonably probable consequence of unseaworthiness." *Saleh v. United States*, 849 F.Supp. 886, 895 (S.D.N.Y. 1994).

12

Liability based on the concept of unseaworthiness is wholly distinct from liability based on negligence because unseaworthiness derives from a condition of the vessel – not limited by conceptions of negligence – and precisely how the condition came into being is irrelevant to the owner's liability for injuries resulting from it.

*In re Hygrade Operators, Inc.*, No. 99 Civ. 3851 (VM) 2001 WL 225028 *4 (S.D.N.Y. Mar. 6, 2001) (internal quotation marks omitted).

Defendants' assertions that the vessel was seaworthy are belied by their own evidence of absent maintenance reports and needed repairs. They admit that there was a failure in the vessel's transmission. Whether it was due to a broken cotter pin that prevented the throttle control cable from operating properly or some other transmission defect, the vessel was arguably not fit to make its journey.

Plaintiff provides some evidence that the vessel was unseaworthy in that it had mechanical problems prior to the date of the collision, previous complaints were made about a transmission cable failure on the vessel, and inadequate investigations were performed to determine any defect. *See* Pl.'s St. at ¶¶ 43, 44. He contends that there is no "proof as to what caused the port transmission to stick in forward gear in a situation where an investigation would be expected." Pl.'s Opp. at 9.

### D. Limitation of Vessel Owner's Liability Act

The Limitation of Liability Act provides in pertinent part, "the liability of the owner of a vessel for any claim, debt, or liability . . . shall not exceed the value of the vessel and pending freight . . . . Claims subject to limitation . . . liabilities . . . are . . . any . . . loss, damage, or injury

13

by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned or incurred *without the privity or knowledge of the owner. See* 46 U.S.C. § 30505(a), (b) (emphasis added).

"Privity or knowledge" is a "term of art meaning complicity in the fault that caused the accident." *See Messina*, 574 F.3d at 126 (quoting *Blacker v. F. Jacobus Transp. Co.*, 243 F.2d 733, 735 (2d Cir. 1957)). In the case of a corporate owner, "liability may not be limited (where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred.)" *Barberi*, 475 F.Supp.2d at 239 (quoting *Coryell v. Phipps*, 317 U.S. 406, 408 (1943)).

Whether a defendant is entitled to limit liability requires a two-part inquiry. The trier must determine if the accident was caused by defendant's negligence. If negligence is shown, the vessel owner must prove that the negligence occurred without its privity or knowledge. *Barberi*, 574 F.3d at 126-27. "Privity like knowledge turns on the facts of particular cases." *Coryell*, 317 U.S. at 411.

When an injury occurs because of the owner's neglect of its duty to use proper care in providing a competent crew and seaworthy vessel, the owner is privy to the negligence. *See Tug Ocean Prince*, 584 F.2d at 1155. As already noted, plaintiff has provided sufficient evidence to raise a genuine issue as to the competence of the Marguerite captain and seaworthiness of the ship as well as the negligence of the Vice President of Operations when he ordered a return of the vessel to the pier at Staten Island before providing Haney with medical care. Control by Miller's headquarters was sufficient to indicate knowledge on the part of an executive in charge.

The nature of the vessel's voyages – providing taxi service over the New York ports' waterways – suggests the opportunity for more detailed control by the owner and responsibility

14

of its executives, who were virtually on the scene, to supervise the vessel's ongoing seaworthiness more closely than if the vessel were on the high seas. The underlying theory of limited liability as a policy to encourage investment in risky, long sea voyages has little relevance to the Marguerite's meanderings within New York harbor, in sight of its home port.

Limitation of liability has not been established.

### E. Maintenance and Cure

#### 1. Generally

Maritime law provides for maintenance and cure payments to a seaman who falls ill or becomes injured while in service of the vessel. *See Farrell v. United States*, 336 U.S. 511 (1949). "Maintenance" refers to the obligation of a shipowner to provide food and lodging, comparable to that received aboard a vessel. *See Marcic v. Reinauer Transp. Companies*, 397 F.3d 120, 129-30 (2d Cir. 2005). "The right to maintenance does not depend on the shipowner's fault or the job-relatedness of the seaman's injury[;]" tort law rules of contributory negligence, comparative fault, assumption of risk and unseaworthiness do not apply. *Id.* (citing *Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975)); *Ammar v. United States*, 342 F.3d 133, 142 (2d Cir. 2003); *see also McMillan v. Tug Jane A. Bouchard*, 885 F.Supp. 452, 459 (E.D.N.Y. 1995). "The shipowner's obligation to pay maintenance lasts until the seaman has recovered or his condition is declared permanent and incurable." *Marcic*, 397 F.3d at 130; *Vella*, 421 U.S. at 5; *Ammar*, 342 F.3d at 142.

"Cure" refers to payments for all aspects of the seaman's medical care until he reaches the maximum practicable medical cure. *See McMillan*, 885 F. Supp. at 459. The sailor bears the burden of persuasion to prove his or her right to maintenance and cure. *Id.*; *see also Carlsson v. United States*, 252 F.2d 352, 353 (2d Cir.1958) ("[T]he right to maintenance and cure may

continue to exist, even after periods of work, or the granting of a fitness certificate, until maximum rehabilitation has been attained."). Once a seaman establishes his right to payments, the burden shifts to the shipowner to prove that the injured employee has reached a point of maximum medical cure. *McMillan*, 885 F. Supp. at 459, 460. "Maximum medical cure" is achieved when the seaman recovers from the injury, the condition permanently stabilizes or cannot be improved further. *Id.* at 459. "Any doubts or ambiguities relating to maintenance and cure must be resolved in favor of the seaman." *Id.* at 460.

Historically, maintenance payments were determined by "taking into account all relevant circumstances, such as the somewhat equivalent costs for housing and food ashore as well as regional differences in prices in the United States." *Ammar*, 342 F.3d at 143 (citation omitted). From 1940 to 1970 the standard payment was $8 per day. *Id.* Collective bargaining agreements ("CBAs") between vessel owners and seamen's unions set rates at the same amount. Later, rates varied among CBAs from $10 per day to $15 and $30 per day. *Id.* These rates seem absurdly low in view of today's costs of living.

As its name suggests, maintenance was originally designed to provide sustenance to a crew member placed ashore while the ship sailed on. The above figures suggest it is now somewhat attenuated for that purpose by long-term inflation. But, while its amount may have shrunk in relative value, its duration remains the period when medical treatment is called for.

### 2. Pain

The Court of Appeals for the Second Circuit appears not to have specifically ruled recently on whether payments to relieve pain and suffering are appropriate under the maintenance and cure doctrine. On occasion courts in this circuit have held that a sailor was entitled to curative, but not palliative treatment for pain. Those decisions rely on precedent that

16

is somewhat ambiguous on the issue. *See, e.g., McMillan,* 885 F.Supp. at 461 ("The rule of law which must be applied in this Circuit dictates that as long as the seaman's condition is susceptible to curative as opposed to palliative treatment, the shipowner is liable for maintenance and cure.") (citing *Berke v. Leheigh Marine Disposal Corp.,* 435 F.2d 1073, 1076 (2d Cir. 1970)); *Desmond v. United States,* 217 F.2d 948, 950 (2d Cir.1954), *cert. denied,* 349 U.S. 911 (1955); *Vella v. Ford Motor Corp.,* 421 U.S. at n. 4; *Nasser,* 191 F.Supp.2d at 317 (allowing payment for "all reasonable medical curative (i.e. not palliative) expenses incurred", citing *McMillan, supra,* at 461).

The Supreme Court has not squarely addressed the issue of whether "cure" encompasses palliative care. In *Vella* the Court held that a shipowner's duty to provide maintenance and cure ends when medical diagnosis is made that the seaman's injury was permanent and incurable. 421 U.S. at 5-6. It expressly reserved decision on the issue of payment for pain and suffering. "[I]t is not necessary to address the question whether the jury award might also be sustained on the ground that the shipowner's duty in any event obliged him to provide palliative medical care to arrest further progress of the condition or to reduce pain, and we intimate no view whatever upon the shipowner's duty in that regard." *Id.* at 6, n.4; *see also Farrell v. United States,* 336 U.S. 511 (1949) (permanently disabled seaman not entitled to maintenance and cure payments after his condition was diagnosed as hopeless).

In *Berke,* the Court of Appeals for the Second Circuit held that treatment for aggravated bronchitis was not part of the vessel owner's "cure" obligation because it would only "relieve the symptoms but would not permanently improve the condition." 435 F.2d at 476. Though it considered and rejected the Third Circuit's now overruled position that "cure" covers payments

17

for pain relief, *see id.* n. 3, the Court of Appeals for the Second Circuit issued no specific holding regarding the validity of payments for pain and suffering.

Maintenance and cure, on the grounds that a condition was incurable, were denied in *Desmond.* 217 F.2d at 950 ("If incurable, the shipowner has no further liability, whether or not the patient requires additional treatment to restrain degeneracy or relieve pain."); *see also Lindgren v. Shepard S.S. Co.,* 108 F.2d 806, 807 (2d Cir. 1940) (reversing judgment for maintenance and cure since treatments to prevent relapse do not "effectuate further cure"); *Muruaga v. United States,* 172 F.2d 318, 321 (2d Cir. 1949) (reversing a judgment for maintenance and cure to a victim of an incurable cardiovascular disease because treatment has provided "all the improvement to be expected in an incurable disease").

Apparently in the Second Circuit where a defendant's negligence aggravates a plaintiff's preexisting condition (causing plaintiff to experience new pain), defendant is liable in full for the treatment of the resulting pain. *See Milos v. Sea-Land Serv. Inc.,* 478 F.Supp. 1019, 1023 (S.D.N.Y. 1979), *aff'd without op.,* 622 F.2d 574 (2d Cir. 1980).

Courts in other circuits have held that treatment to relieve pain is "palliative" and does not support maintenance and cure payments since reduction of pain or its intensity does not affect the underlying medical problem. *See, e.g., Whitman v. Miles,* 387 F.3d 68 (1st Cir. 2004) ("[T]reatment that is more than simply palliative, and would improve [the seaman's] medical condition . . . is enough to support an award of maintenance and cure in aid of permanent improvement short of a complete cure. (internal quotations and citation omitted)); *Cox v. Dravo Corp.,* 517 F.2d 620, 627 (3d Cir. 1975) (overruling *Neff v. Dravo Corp.,* 407 F.2d 228 (3d Cir. 1975) (vessel and cargo owner are not required to insure against the cost of palliative or preventive care); *Stanovich v. Jurlin,* 227 F.2d 245, 246 (9th Cir. 1955) (holding "palliative" is

18

not covered by meaning of "cure" since it is defined as "to ease without curing"); *Lopinto v. Crescent Marine Towing*, No. Civ.A. 02-2983, 2004 U.S. Dist. Lexis 13405 (E.D. La. Aug. 2, 2004); *Sefcik v. Ocean Pride Alaska*, 844 F.Supp. 1372, 1373 (D. Alaska 1993) ("A vessel owner must only pay for curative, as opposed to palliative, medical treatment."); *see also, e.g.*, Robert Force, *Admiralty and Maritime Law* 90 (Fed. Jud. Center 2004) (citing *Farrell v. United States*, 336 U.S. 511 (1949), for the proposition that "an employer has no obligation to provide maintenance and cure payments for palliative treatments that arrest further progress of the condition or relieve pain once the seaman has reached the point of total disability"); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 299 n. 52b (2d ed. 1975) ("'Cure' in the phrase 'maintenance and cure' originally meant 'care.' One of the odd by-products of the Farrell case is that the meaning of 'cure' has now shifted to that of recovery from disease or injury."). Gilmore and Grant explain that *Farell*, does not create,

> any time limit on the duration of the shipowner's liability, so long as there is a chance of improvement in the claimant's condition. The majority opinion in Farrell seems to take the position that 'cure' means improvement, or the possibility of improvement, and that Farrell could not recover medical expenses necessary to maintain him in his present condition without further deterioration.

*Id.* at 299.

Current general medical practice raises doubts about these hoary limitations on medical treatment to alleviate the kind of persistent pain and suffering Haney is allegedly experiencing. New theories on medical treatment for pain relief, and an evolving sense of the importance to doctors and patients of well-being and quality of life issues, include pain management. Palliative care is now encompassed in the notion of recovery and maximum improvement. The medical

19

profession has a specialty for pain medicine and an association dedicated to fostering advocacy, research and training in the field. *See* American Academy of Pain Medicine ("AAPM") (representing physicians practicing in pain medicine). The AAPM notes that "[t]he practice of pain medicine is multi-disciplinary in approach, incorporating modalities from various specialties to ensure the comprehensive evaluation and treatment of the pain patient." *See* AAPM, Mission Statement, *available at* http://www.painmed.org/ (last visited Nov. 15, 2010) (indicating that pain medicine crosses numerous fields including anesthesiology, internal medicine, neurology, neurological surgery, orthopedic surgery, physiatry (rehabilitation physicians who treat nerve, muscle, and bone injuries), and psychiatry). Physicians note that "[p]ain is one of the most common reasons people seek medical care." Richard M. Mularski et. al., *Measuring Pain as the 5th Vital Sign Does Not Improve Quality of Pain Management*, 21 J. of Gen. Internal Med. 607, 607 (2006) ("[C]hronic pain has been estimated to be under treated in up to 80% of patients in some settings."). "Uncontrolled pain not only results in unnecessary suffering, but compromises the care of underlying diseases and can lead to depression, decreased enjoyment of life, and less productivity." *Id.*

When a patient is assessed for treatment at a medical facility it is now standard practice to measure the individual's pain along with his temperature, pulse, respirations and blood pressure. *See* Veterans Health Admin., *Directive 2009-053: Pain Management*, *available at* http://www1.va.gov/PAINMANAGEMENT/docs/VHA09PainDirective.pdf (last visited Nov. 15, 2010) (discussing "Pain as a Fifth Vital Sign" initiative); *see also* Mularski et. al, *supra*, at 611 ("Additional interventions are needed to improve providers [sic] awareness of patients' pain and to increase the rates at which they provide appropriate therapy." ). *See also, e.g.,* American Academy of Pain Management, *Assessing and Treating Low Back Pain An Interview with Bruce*

*Nicholson M.D.*, 15 The Pain Practitioner 3, 17-21 (Fall 2005) (discussing numerous treatment options for back pain including medical, surgical and other non-invasive therapies); Sepulveda et. al., Palliative Care: The World Health Organization's Global Perspective, 24 J. of Pain and Symptom Mgmt. 2 (Aug. 2002) (discussing importance of developing palliative care systems to improve quality of life of sick and injured); Pub. L. No. 106-386 (Oct. 28, 2001) (declaring the calendar decade beginning in January 1, 2001 the Decade of Pain Control and Research).

One problem with compensation for pain is that so much of it is subjective and incapable of a precise objective evaluation. *See, e.g.*, Marcia L. Meldrum, *A Capsule History of Pain Management*, 290 J. of the Am. Med. Assoc. No. 18, Nov. 12, 2003 at 2470 (2003) ("Pain is a complex clinical problem. Assessment depends on verbal report, and the patient's physical perceptions may be modified by cognitive and affective factors.").

The cost of maritime insurance may possibly be increased by a change of law to include pain alleviation in "cure." The same issue exists with respect to compensation for injuries and tort law generally. There appears no reason why adequate control against excessive recoveries cannot be provided in admiralty cases.

Whether pain is included in medical treatment may be a question of fact for the jury. It is time to reconsider the old rule, now out of the main stream of medical practice. In any event, the probable need for further surgery suggests that in the instant case treatment may not have been completed even in its traditional sense.

### 3. Additional Treatment

Miller has paid Plaintiff approximately $38,000 in maintenance and cure. Defs.' Mem. at 15. Its expert examined Haney and determined that he had reached maximum medical cure and was fit to return to work. *Id.*; *see also*, Defs.' Ex. 9 at 8, 14 (Report of Dr. Head and Report of

21

Dr. S.W. Bleifer). Plaintiff seeks additional payments for spinal surgery. *See* Pl.'s Opp. at 12. Plaintiff's treating physician stated that his medical condition, degenerative disk disorder, would improve with such surgery. *Id.*; *see also*, Pl. Ex. L (Report of Dr. Chang). Surgery has been delayed because Miller does not believe it is required under the routine maintenance and cure doctrine. *See* Pl.'s St. at ¶¶ 59, 60. There is also a question of whether Haney's preexisting disk disorder is unrelated to the accident, (*see* Def. Ex. 9), or whether the accident exacerbated a preexisting condition. *See* Pl. Ex. L. Plaintiff's treating physician indicates that Haney's pain and the back condition were precipitated by the accident, noting that plaintiff never complained of prior symptoms. *See id.* These questions of fact require a trial.

## V.     Conclusion

Defendant's motion for summary judgment is denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: November 15, 2010
          Brooklyn, New York